[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Dennis Spicuzza ("Plaintiff") brings this action against Steven M. Pare, in his capacity as Superintendent of the Rhode Island State Police ("Superintendent") and the State of Rhode Island ("State" and collectively "Defendants"). In his complaint, Plaintiff appeals the administrative decision of the Superintendent denying his request for a disability pension under G.L. 1956 § 42-28-21. Plaintiff also seeks relief under the Declaratory Judgment Act to obtain a finding that he is: entitled to recover a disability pension under G.L. 1956 § 42-28-25.1; and that he is entitled to recover injured on-duty benefits under either G.L. 1956 § 42-28-25.1 or G.L. 1956 § 45-19-1. Plaintiff further claims that Defendants are estopped from denying liability in this case because they paid Plaintiff's medical expenses and provided him with other benefits following his claim of on-the-job injury.
Plaintiff bases his action on his contention that he is totally and permanently disabled from performing the duties of a State Police officer and that his disability is the result of injuries he sustained in the course of his training at the Rhode Island State Police Academy ("Academy"). Defendants do not deny Plaintiff's allegation that he is totally disabled, but they dispute his assertion that his disability is causally connected to injuries suffered at the Academy.
 SUMMARY OF DECISION
This matter was tried before the Court sitting without a jury. After reviewing the evidence and the applicable law, the Court finds as follows:
1. That the Plaintiff sustained injuries while participating in boxing matches during his training at the Academy. Those injuries aggravated a pre-existing condition, trigeminal neuralgia, and also caused another condition; diplopia, double vision. Those two conditions render him totally and permanently disabled;
2. That the Plaintiff's administrative appeal is denied because Plaintiff was injured as a trainee and was not entitled to recover benefits under the statutory scheme existing as of the date of the Superintendent's decision;
3. That the Plaintiff is entitled to receive a disability pension under § 42-28-25.1, which provides such benefits to recruits who are injured in the course of their training. That statute was enacted after this action was commenced and applies to actions pending on the date of passage;
4. That the Plaintiff is not entitled to recover injured on-duty benefits; and
5. That the Defendants are not estopped from denying liability with respect to his claim for such benefits.
 FINDINGS OF FACT
In July 1999, Plaintiff, Dennis Spicuzza, received a conditional and contingent offer of employment with the Rhode Island State Police ("State Police"). This offer reflected the realization of his life-long dream to become a Rhode Island State Trooper. Plaintiff previously served on active duty with the Navy and as a police officer with the town of Johnston.
Plaintiff entered the State Police Academy as a recruit/trainee on January 9, 2000 and began a 23-week training program. Plaintiff was in good physical condition when he entered the Academy and had no significant complaints of pain nor did he suffer from any visual disturbances.
This case has provided the Court with an interesting opportunity to learn about the rigorous training required of State Police recruits before they become State Troopers. The trainees perform strenuous physical activity and attend classes on a variety of subjects that relate to law enforcement. They function in a boot camp setting which tests their discipline, resolve and strength.
Before he entered the Academy, Plaintiff learned that recruits were required to engage in boxing matches as part of their physical training. He had no prior boxing experience and attempted to familiarize himself with the activity by attending the boxing gym of the civilian who ran the Academy's boxing program.
Plaintiff boxed five opponents on four different dates. He won only one match, which he attributes to his opponent's fatigue. Plaintiff sustained severe facial trauma during his last boxing match on February 17, 2000, and perhaps also during his match on February 15, 2000. Photographs of one of his fights depict facial injury and blood.
Two paramedics were present at the boxing match on February 17, 2000, and they testified about the beating that Plaintiff endured on that occasion. They observed a large quantity of blood and deformity to the bridge area of Plaintiff's nose. Initially, they were gestured away by someone monitoring the fight, but later they were allowed to treat the Plaintiff. The paramedics questioned Plaintiff and determined that he was alert, but he told them that everything had gone black. They attempted to stop the bleeding, but they ran out of towels and had to return to their vehicle for further materials.
It was clear from their testimony that they were both upset that the boxing match continued even after Plaintiff clearly was injured. They noted that someone packed his nose and sent him back into the ring to complete the match. According to their testimony, emergency medical personnel do not perform such procedures because they can cause even more damage to the injured person. They urged Plaintiff to accept transportation to the hospital for treatment, but he rejected that offer.
Plaintiff was afraid to accept transportation to the hospital for fear that he would jeopardize his status as a recruit. On the weekend following the fight, Plaintiff sought medical care for his injuries. He suffered a non-displaced fracture of the distal nasal bones and a nasal septal deviation. He also sustained a shifting of the tooth position in his dental arch. A previously prescribed night guard no longer fit. Plaintiff treated for these diagnosed conditions and continued with the training program.
Trigeminal Neuralgia
In addition to the aforementioned injuries, Plaintiff began to experience severe pain on the right side of his face following the boxing matches. The pain was so excruciating that he sought treatment for it in September 2000 with both a neurologist, Dr. Albert J. Marano, and then with a neurosurgeon, Dr. Stephen Saris. Plaintiff described the pain as incapacitating in nature, occurring twice a day and lasting up to two hours each time.
Plaintiff's medical history was remarkable for prior occurrences of right sided facial pain which had subsided long before he entered the State Police Academy. In 1991, he treated with an oral surgeon with complaints of facial discomfort. In 1995, he complained of facial pain to his primary care provider, who then questioned whether Plaintiff suffered from trigeminal neuralgia. He referred Plaintiff to a neurosurgeon in 1995. Additionally, a dentist previously extracted four teeth from the upper right side of Plaintiff's mouth in an effort to alleviate an occurrence of facial pain.
Although it is clear that Plaintiff did receive medication for his previous complaints of facial pain from some physician, it is not clear as to when the medication was prescribed and by whom. Additionally, it is clear that four of his teeth were extracted because dental charts were offered into evidence from dental treatment rendered to him before and after the extractions occurred. Nonetheless, it is unclear which dentist extracted the teeth and when the extractions occurred.[1]
Both Dr. Marano and Dr. Saris diagnosed Plaintiff as suffering from trigeminal neuralgia. Over the past five years, Plaintiff has undergone two surgical procedures, has taken a variety of medications and has searched for other treatments in an unsuccessful effort to alleviate the pain. Plaintiff was asymptomatic when he entered the training program, but has experienced fairly constant facial pain since he was injured while boxing at the Academy. Dr. Marano testified that Plaintiff's symptoms of trigeminal neuralgia are permanent in nature because they are so severe and have continued to recur in spite of the numerous treatments. The Court accepts that opinion as credible.
Dr. Saris explained that trigeminal neuralgia is a condition in which there is pain on one side of the face, either the right or left side. He testified that there are twelve nerves that come out of each side of the brain, numbered 1-12. Nerve number five (or Roman numeral "V") divides into three sub-parts, V1, V2 and V3. V1 goes to the forehead, V2 goes to the cheek, and V3 goes to the chin. When one of the divisions of this nerve is effected by any of a number of things, it can cause pain shooting into the forehead, cheek or chin. He testified that most of the time the pain comes from compression of the nerve by a blood vessel, usually an artery, but sometimes a vein.
Dr. Saris stated that the compression of a trigeminal nerve is a function of a person's anatomy and is not caused by trauma. Dr. Saris testified that a patient with a history of trigeminal neuralgia is vulnerable to a recurrence. He opined that it is a "fickle" condition that can appear, go away and then return. Although Dr. Saris eliminated trauma as a cause of trigeminal neuralgia, he did not offer an opinion, nor was one requested of him, as to whether trauma could cause a recurrence or aggravate a pre-existing condition. Dr. Saris' report did note that Plaintiff was able to trigger the pain by pressing on part of his mouth and tongue. If such relatively benign pressure triggers pain in a person suffering from the condition, could significant facial trauma aggravate a dormant condition?
Dr. Marano answered that question in the affirmative, and his testimony on this point was uncontradicted and consistent with the facts of the case. Those facts included Plaintiff's prior history of facial pain that probably was associated with trigeminal neuralgia; the fact that he was symptom free for a significant period of time prior to entering the Academy; the fact that he sustained a significant facial injury in the Academy; and the fact that the symptoms recurred and have continued thereafter.
Dr. Marano testified that "the trigeminal neuralgia may certainly have been a preexistent condition prior to the trauma that he experienced in his facial region, skull, neck. However, clearly, the trauma exacerbated this preexistent condition and in a way woke a sleeping giant because, obviously, his pain had been relentless to that." (Dep. of Marano at 29, lines 15-25.) "What the trauma did was exacerbate this preexisting condition, made it worse, made it refractory, in a sense." (Dep. of Marano at 30, lines 20-22.)
The Court accepts Dr. Marano's opinion as to causation and finds that the injuries Plaintiff sustained during one or more boxing matches at the Police Academy aggravated his previous condition of trigeminal neuralgia and caused the symptoms from which he has suffered since February 17, 2000.
Diplopia
In spite of his injuries and the recurrence of severe facial pain, Plaintiff continued with the training program and graduated with his class on June 17, 2000. After successfully completing the probationary period, Plaintiff assumed the duties of Rhode Island State Police Officer.
On a few occasions from mid to late 2000 to April 2002, Plaintiff encountered difficulty driving. These incidents were described by witnesses, Deputy Chief Gary Maddocks ("Maddocks), and Rhode Island State Trooper, Alfred Ruggiero ("Ruggiero"). Plaintiff had no prior history of double vision or other visual disturbance.
Maddocks, Plaintiff's long-time friend and colleague on the Johnston police force testified about an incident that occurred at the end of 2000, or the beginning of 2001. On that occasion, he was a passenger in Plaintiff's personal vehicle when Plaintiff crossed the center line. When Maddocks questioned him about the incident, Plaintiff broke down and confessed that he had been encountering problems with his vision since he was injured boxing in the Training Academy.
Ruggiero also knew Plaintiff for many years prior to their mutual employment with the State Police. His testimony was similar to that of Maddocks. Ruggiero testified that he rode as a passenger with Plaintiff in the late summer of 2000 when Plaintiff crossed the double yellow lines. When Ruggiero brought the problem to his attention, Plaintiff told him that he had not realized that he was driving left of center. He did acknowledge that he had not been feeling right since graduation from the Academy. Plaintiff did not then indicate that the problems were related to the boxing injuries.
On a subsequent occasion — over a year later, Plaintiff struck a pole while driving a State Police vehicle. He told Ruggiero that he did not realize that the pole was so close to his car. Ruggiero suggested to him that he might want to get the problem checked out medically.
Another State Police Officer, Gregory Long ("Long"), offered testimony about Plaintiff's driving difficulties. Long met Plaintiff when Spicuzza was a Johnston Police Officer, and they became friends. Before Plaintiff entered the Academy, he and Long regularly worked out together at a gym. Long did not observe any problems with Plaintiff's ability to participate in physical activities until after he graduated from the Academy. Within a few months after graduation, he saw Plaintiff walk through an aluminum screen door. Plaintiff made light of the incident.
Long testified about other problems he witnessed. He stated that he observed Plaintiff swerve his vehicle from lane to lane, a problem which Plaintiff then attributed to headaches. This is significant because it demonstrates Plaintiff's inability to identify the actual reason for his driving difficulties. It buttresses Plaintiff's testimony that initially he did not understand that he suffered from double vision.
On another occasion, Long observed Plaintiff attempt to place a pill bottle on a table; and he missed, and the bottle fell to the floor. He testified that at times, Plaintiff became frustrated and upset when he was unable to complete a sentence because he had forgotten what he had intended to say. Long testified that Plaintiff attempted to minimize his problems when he discussed them with Long.
In January 2002, now retired State Police Commander, Ronald Lepre ("Lepre"), assumed the role of Patrol Commander of the Portsmouth barracks. He testified that during this period of time, he had contact with Plaintiff at work. He testified that on numerous occasions Plaintiff would return to the barracks complaining of headaches. He found Plaintiff sitting in a room with the shades pulled down and spoke to him about his problems. Lepre testified that Plaintiff told him that he was sensitive to light, suffered from headaches and double vision.
By April 2002, Plaintiff had reported the problems he encountered while driving to his superiors at work, and he was placed on a light duty desk job. According to Lepre, Plaintiff told him that the problems began after he engaged in boxing at the Academy, but on cross-examination, he admitted that on a prior occasion he had stated that Plaintiff told him that he had been experiencing headaches for a few months. The Court finds that in spite of Lepre's prior inconsistency, overall, he was a credible witness.
Plaintiff continued to work on a light duty job until he left work in October 2002. He applied for and was denied a disability pension benefit. In his denial letter of September 11, 2003, the Superintendent acknowledged that the Plaintiff was not then medically fit for duty, but stated that "[t]he medical professionals are unable to conclude that your boxing injuries caused the vertical strabismus, double vision, and trigeminal neuralgia, which would be necessary to make a determination that the injuries occurred in the course of performance of your duties as a member of the Rhode Island State Police." (Joint Exhibit 18.) Plaintiff was terminated from his employment with the Rhode Island State Police, effective November 1, 2003. Plaintiff takes his administrative appeal from the Superintendent's letter of September 11, 2003.
Plaintiff appeared at trial and offered testimony on his own behalf. He made a sympathetic witness and appeared sincere and candid. However, Plaintiff is not a good historian of his own medical history. The Court cannot rely on his testimony alone to determine the cause of his conditions. The Court had to sift through the exhibits and rely upon the testimony of his two treating physicians and the aforementioned lay witnesses to determine the onset and cause of Plaintiff's complaints.
Plaintiff claims that he sustained a visual disturbance as a result of boxing at the Training Academy. Yet, he specifically denied suffering from double vision when he first visited Dr. Marano and Dr. Saris. Plaintiff claims that he felt "funky" after the boxing injuries, but he did not associate those symptoms with double vision. At first blush, it may seem peculiar that Plaintiff could not identify the source of his problems. However, when the Court considers all of the evidence in the case, including the Plaintiff's testimony, the testimony of others and the medical records, the contention has a ring of truth to it.
Plaintiff had a tendency to minimize, hide or ignore his ailments because he truly wanted to succeed as a State Trooper. Additionally, Plaintiff's recollection of dates and events is lacking. He testified over the course of two days, and the Court noted that he encountered difficulty in concentrating on the questions asked of him and in articulating responses to those questions. Those difficulties were more pronounced on the second day of his testimony, but were present on the first day as well. These observations are consistent with the findings of his treating psychologist, Dr. Francis Sparadeo.
Nonetheless, the Court finds the testimony of Maddocks, Ruggiero and Long credible and reliable. Their testimony supports Plaintiff's contention that diplopia was caused by the trauma he sustained at the Academy. The Court accepts the medical testimony from Plaintiff's treating physicians that Plaintiff suffers from diplopia and that he received that condition as the result of trauma.
Dr. Marjorie Murphy, the neuro-opthalmologist treated Plaintiff for diplopia and prescribed prism glasses. She diagnosed "mild left IV nerve palsy which accounts for his symptoms of diplopia as well as visual confusion."
Although Defendants have suggested that Plaintiff developed diplopia as a side effect of undergoing the radiofrequency lesion procedure, Defendants did not offer any medical evidence to support that suggestion. The evidence, in fact, suggests otherwise. Dr. Marano explained that the surgery affected nerves on the right side of Plaintiff's face and could not have caused a visual disturbance on the left side.
Dr. Saris testified that if Plaintiff had complained of double vision when he saw him on September 14, 2000, he would have noted it because it would imply damage to a nerve other than the one he was trying to treat. The Court infers from this statement and from Marano's testimony that Saris did not treat a nerve that would have resulted in the double vision complained of. The evidence suggests that Dr. Saris operated on the right side on the fifth nerve. The double vision is associated with his left side on the fourth nerve.
Dr. Marano clearly connects the diplopia to blunt trauma. Dr. Murphy also suggests that "[T]he etiology may well have been traumatic given his history of repeated blows to the head during boxing matches and the onset of his symptoms shortly thereafter." Dr. Marano offered an opinion that the diplopia was caused by the boxing injuries which Plaintiff sustained as a State Police trainee. Dr. Marano testified that Plaintiff's diplopia is permanent and totally disabling.
For these reasons, the Court finds that the Plaintiff's diplopia was caused by his boxing injuries, and that its onset coincided with those injuries. Plaintiff tried to ignore the problem and then associated it as part and parcel of his facial pain.
 FINDINGS OF LAW DECISION OF THE SUPERINTENDANT UNDER G.L. 1956 § 42-28-21
This Court reviews the decision of the Superintendent in accordance with the standard set forth by the Rhode Island Supreme Court in Canariov. Culhane, 752 A.2d 476 (R.I. 2000). In that case, an off-duty member of the State Police returned to the barracks on his own motorcycle, with his wife as passenger, to verify that the flag had been removed from the flag staff. On his way home, he sustained serious injuries in a motor vehicle accident. Canario filed a request for a disability pension under §42-28-21(a), which provides for a disability pension at 75% of an officer's annual salary in the event that the officer ". . . shall have in the course of performance of his or her duties suffered injury causing disability. . . ." The superintendent denied the claim after finding that the injury did not occur in the course of performance of his duties.
In Canario, the Court noted that it gives great deference to the discretionary authority of the superintendent in cases involving the grant of a disability pension. The superintendent has great discretion in determining an officer's eligibility for a pension, and his or her decision will not be disturbed on appeal unless the Court finds that it was arbitrary and capricious. Id. See also Ferreira v. Culhane,736 A.2d 96, 97 (R.I. 1999).
In this case, Plaintiff applied for a disability pension under §42-28-21. The Superintendent denied the application based upon a finding that the Plaintiff had failed to offer sufficient evidence that the boxing injuries caused the visual disturbance and the trigeminal neuralgia. He suggests that such a finding "would be necessary to make a determination that the injuries occurred in the course of performance of your duties as a member of the Rhode Island State Police." (Joint Exhibit 18.) The Superintendent did not base his decision on the fact that Plaintiff was a trainee when he allegedly was injured and not a member of the State Police.
The Court disagrees with the Superintendent's factual conclusion that the medical evidence does not support a finding that Plaintiff's disability was causally connected to his boxing injuries. For the reasons set forth previously, the Court finds that the medical evidence does support such a finding. The applicable standard of review does not permit the Court to substitute its findings of fact for those of the Superintendent. The Court should sustain the decision of the Superintendent even against doubts as to its correctness unless the Court finds that the administrative decision was arbitrary and capricious. In this case, the Court need not engage in that exercise because the Superintendent's decision denying the disability pension should be upheld regardless of whether his factual findings on causation are erroneous.
In accordance with the then applicable statutory scheme, Plaintiff was not entitled to receive a disability pension under § 42-28-21. He sustained his disabling injuries as a recruit/trainee, not as a member of the division. As of September 11, 2003, there was no statutory authority to award a disability pension to any member of the State Police Academy who suffered injury causing disability in the performance of his or her duties as a recruit/trainee. Accordingly, Plaintiff's application should have been denied as a matter of law. The Court may uphold a correct administrative decision even if it was reached through faulty reasoning or mistake of law. See Mesolella v. City of Providence, 439 A.2d 1370 at 1373 (R.I. 1982). As such, the decision of the Superintendent denying Plaintiff's application for a disability pension is upheld.
 REQUEST FOR DECLARATORY RELIEF UNDER G.L. 1956 § 45-19-1
Plaintiff claims that he is entitled to injured on-duty benefits under § 45-19-1, which provides, in pertinent part:
 § 45-19-1. Salary payment during line of duty illness or injury.
 (a) Whenever any police officer . . . of . . . the state of Rhode Island is wholly or partially incapacitated by reason of injuries received or sickness contracted in the performance of his or her duties . . . the state of Rhode Island . . . shall, during the period of the incapacity, pay the police officer . . . the salary or wage and benefits to which the police officer . . . would be entitled had he or she not been incapacitated. . . .
 (b) As used in this section, "police officer" means and includes any chief or other member of the police department of any city or town regularly employed at a fixed salary or wage and any executive high sheriff, sheriff, deputy sheriff, member of the fugitive task force, or capitol police officer.
Plaintiff is not entitled to recover on-duty benefits under this section because his injuries were not contracted in the performance of his duties as a State Police officer. This section does not apply to trainees.
 REQUEST FOR DECLARATORY RELIEF UNDER G.L. 1956 § 42-28-25.1 FOR DISABILITY PENSION
On July 9, 2004, long after the Superintendent denied Plaintiff's request for a disability pension under § 42-28-21, the General Assembly passed a law providing compensation to trainees of the State Police who are injured while in training. The statute took affect upon passage and applied to all cases pending on that date, which includes this case. Under this new statute, trainees are entitled to the disability pensions available to members of the State Police under § 42-28-25. The section provides, in pertinent part:
 R.I. Gen. Laws § 42-28-25.1 Trainee compensation for death, disability or injury.
 (a) All trainees of the state police training academy shall be compensated for death, disability, or injury incurred while in training under the provisions of this chapter as follows:
 . . .
 (2) Death and disability payments shall be paid in accordance with § 42-28-21 and § 45-19-1 relating to compensation for injuries causing disability . . . to full-time members of the state police in the course of performance of their duties.
In his complaint, Plaintiff asks the Court to declare that he is entitled to recover a disability pension under § 42-28-25.1 at 75% of his annual salary. Plaintiff did not obtain an administrative decision from the Superintendent with respect to this new statute before applying for declaratory relief from the Court. However, neither § 42-28-21 nor §42-28-25.1 require an applicant exhaust his or her administrative remedies before seeking declaratory relief in Court. See Canario v.Culhane, 752 A.2d 474.
In Canario, the Court noted that the Uniform Declaratory Judgments Act, chapter 30, title 9, gives the Superior Court the jurisdiction to construe the rights and responsibilities of any party arising out of a statute. The Court has this power as part of its original jurisdiction. Since the applicable statutes governing disability pensions for officers and trainees do not require an administrative remedy, this Court has subject matter jurisdiction to consider his claim under the Declaratory Judgment Act.
The Court is not bound by the same standard of review governing an appeal from a decision of the superintendent, but is free to make its own findings of fact. The Court has determined that the Plaintiff suffered disabling injuries as a trainee at the Academy and that those injuries render him totally and permanently disabled from performing the duties of a State Police officer. As such, the Court finds that Plaintiff is entitled to recover a disability pension under § 42-28-25.1. The parties have agreed that if Plaintiff is entitled to a disability pension under this statute, he would be entitled to receive an annual pension of $36,757.13, which is 75% of his salary of the stipulated salary of $49,009.50.
 REQUEST FOR DECLARATORY RELIEF UNDER G.L. 1956 § 42-28-25.1 FOR INJURED ON DUTY BENEFITS
The Plaintiff is not entitled to receive injured on-duty benefits as well as a disability pension under § 42-28-25.1. Plaintiff successfully completed the training program and did not suffer a loss of wages while attending the Training Academy. He did not suffer a loss of income when he served as a probationary officer nor did he lose wages thereafter when he became a member of the State Police. In fact, based upon representations of counsel, he has continued to receive his salary as a State Police officer in spite of being terminated. The Court understands that the Defendants do not intend to seek reimbursement for any amounts paid to Plaintiff while this case was pending. These facts render Plaintiff's claim for injured on-duty benefits moot.
Although § 42-28-25.1 entitles Plaintiff to the same benefits he would receive under § 45-19-1, those benefits do not amount to a lifetime pay check. Section 45-19-1 is not a retirement act and applies to officers who remain members of the department. See Webster v. Perrotta, 774 A.2d 68
(R.I. 2001). Additionally, Plaintiff's position as a State Police officer carried a three-year term, and that term has expired. Plaintiff claims that he is totally and permanently disabled and seeks a disability pension. The Court finds that he is entitled to receive that pension. He is not entitled to recover injured on-duty benefits.
 CONTENTION THAT DEFENDANTS ARE ESTOPPED FROM DENYING PLAINTIFF'S CLAIMS
Plaintiff's claim of estoppel is moot as it relates to his request for a disability pension because the Court has ruled in his favor on that claim. Plaintiff cannot recover under this theory for injured on-duty benefits. Defendants cannot be penalized for compensating Plaintiff while this case has been pending. Rule 409 of the Rhode Island Rules of Evidence and public policy considerations prohibit evidence that a defendant has furnished medical expenses or similar expenses occasioned by a plaintiff's injury. Defendants should not be penalized for providing assistance to an injured claimant. To do so would discourage similar humane gestures out of fear that such generosity would result in an admission of liability. Likewise, in this case, the fact that Defendants have paid Plaintiff's medical expenses and have paid his salary should not be construed as an admission of liability on the part of the State.
 CONCLUSION
For the foregoing reasons, the Court finds as follows: the Court upholds the September 11, 2003 decision of the Superintendent because Plaintiff was not then entitled to recover a disability pension under §42-28-21; the Court grants Plaintiff's claim for a disability pension under § 42-28-25.1. Plaintiff is entitled to recover a disability pension of 75% of his stipulated salary; the Court denies Plaintiff's claims for injured on duty benefits under § 42-28-25.1 and under § 45-19-1; and the Court denies Plaintiff's claim of estoppel. Counsel shall submit an appropriate order for entry, consistent with this decision.
[1] The Court notes that Plaintiff suffers from cognitive deficits related to head trauma. When he testified at trial, he displayed an inability to recall events and to articulate responses to the questions asked of him.